Filed 10/18/24  P. v. Cervin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098306 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F02356) |
| v. | |
| MANUEL CERVIN, | |
| Defendant and Appellant. | |

In 2008, a jury found defendant Manuel Cervin guilty of second degree murder and the trial court sentenced him to 15 years to life for that offense.  In 2020, Cervin petitioned for resentencing pursuant to what is now Penal Code section 1172.6,[1] arguing he could no longer be convicted of second degree murder.  Following an evidentiary

---

[1] Undesignated statutory references are to the Penal Code.  Cervin filed his resentencing petition under former section 1170.95.  Effective June 30, 2022, the Legislature renumbered former section 1170.95 to section 1172.6 without substantive change.  (Stats. 2022, ch. 58, § 10.)  We will cite to the current section 1172.6 throughout this opinion.

1

hearing, the court concluded Cervin was still guilty of implied malice murder as an aider and abettor and denied the petition.  On appeal, Cervin argues that the trial court misunderstood the legal requirements for aiding and abetting implied malice murder and that insufficient evidence supports the trial court's conclusion.  Finding no merit to these contentions, we affirm the order denying the section 1172.6 petition.

BACKGROUND

In 2007, the People charged Cervin with the first degree murder (§ 187, subd. (a)) of M.G. and alleged that Cervin committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and that a principal personally used a firearm (§ 12022.53, subds. (b), (c), (d) & (e)(1)).  At trial, M.G.'s girlfriend testified that she was driving M.G. home on the night of December 22, 2006.  As they approached M.G.'s home, they encountered an occupied silver car blocking the driveway entrance.  When the car did not move, M.G. honked the horn.  The silver car moved forward, M.G.'s girlfriend turned into the driveway, and M.G. got out.  The silver car traveled a few houses down before reversing back to the driveway.  M.G.'s girlfriend attempted to reverse out of the driveway but was blocked in by the silver car.  M.G. threw up his arms and yelled, "What the fuck?"  The driver rolled down the window.  The four male occupants of the silver car were smiling.  After the driver and the front seat passenger said something back to M.G., the front seat passenger shot M.G., killing him.  M.G.'s girlfriend saw no remorse in their facial expressions; rather, they looked "like they just had a good time."

The People introduced evidence that Cervin was the driver of the silver car. Cervin was a member of the Franklin Boulevard (sometimes spelled Franklon) gang, which is a subset of the Norteño gang.  The three other passengers were also fellow gang members, all associated with the Norteño gang.  One witness testified that Cervin had attempted to recruit him into the gang.  Earlier on the day of the shooting, Cervin was at a pizzeria posturing about being "the Madman from the Boulevard."  While there, Cervin admired another individual's video game shooting skills, referring to him as "my little

2

hitter." He also stated he wanted to shoot someone. Cervin typically hung out with other Norteño gang members.

Multiple witnesses were reluctant to talk to police or testify at trial out of fear for their safety. One witness initially failed to report to court because he "was feeling threatened about coming" as he knows "what happens in these kinds of situations." Another witness had been told to shut up because "[n]o one wants to be a snitch, especially when it's gang related."

In response to hypothetical questions pertaining to gangs, gang culture, and the Norteño gang, an expert witness testified that: (1) it is unlikely for gang members to leave their guns somewhere; (2) if a gang member had a gun earlier in the day, they would likely still have it at night in case something happens; (3) it is highly probable that gang members would know if there is a gun in their car in case they encounter problems; (4) if an unknown car honks at a car containing gang members, it would be perceived as an act of disrespect, with the driver likely feeling the most disrespected; and (5) it is foreseeable that a shooting could occur in response to that disrespect.

In his defense, Cervin introduced a recording of his interview with two detectives. At first, he denied any involvement in the murder, specifically denying driving the silver car and being a gang member. However, he eventually admitted that: (1) he was the driver of the silver car the night of the incident; (2) a person named Nick was in the front passenger seat, while two other passengers were in the back; (3) Cervin turned the car around to confront M.G. when Nick shot the victim; (4) Cervin had seen Nick with a gun at Nick's house shortly before the shooting; (5) after the shooting, Cervin switched to his sister's car and discarded the shirt he was wearing; and (6) Cervin goes by the name Madman. Cervin claimed that he only intended to beat up the victim, not kill him. He also claimed that he did not believe Nick brought the gun in the car and that his mother cleaned out the silver car after the incident because she was a "neat freak."

The jury found Cervin not guilty of first degree murder but guilty of second degree murder as a lesser included offense. The jury found true the gang and firearm allegations. The trial court sentenced him to 15 years to life for second degree murder and 25 years to life for the firearm enhancement. The court also sentenced him to 10 years for the gang enhancement but stayed the sentence pursuant to section 654. Cervin appealed and we affirmed the judgment in an unpublished opinion. (See *People v. Cervin* (Mar. 27, 2012, C060848) [nonpub. opn.].)

In 2020, Cervin petitioned for resentencing pursuant to section 1172.6, arguing he could no longer be convicted of second degree murder given the legislative changes to murder liability. The trial court issued an order to show cause. The parties submitted the trial record as evidence for the court to consider in deciding the petition.

Prior to deciding the merits, the trial court requested briefing on the requirements for aiding and abetting implied malice murder. Cervin argued that the only life-endangering act in this case "is the act of firing the gun." At a hearing on this issue, the court said to defense counsel: "There could be acts that the direct aider and abettor participated in that lead to the life endangering act itself of the acts of the shooter, the perpetrator? [¶] . . . [¶] So the actus reus includes whatever acts plural, not one act, constitute aiding the commission of the life endangering act, one act. [¶] Life endangering act. In this case I totally agree with you. The act is pulling a gun and firing it at [M.G.] That's the life endangering act. The question for me is, is Mr. Cervin a direct aider and abettor?"

The trial court ultimately concluded Cervin was still guilty beyond a reasonable doubt of implied malice murder based on an aiding and abetting theory. In issuing its decision, the court cited repeatedly to our decision in *People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*). The court explained: "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [¶] In the context of implied malice, the actus reus required of the perpetrator

4

is the commission of a life endangering act.  [¶]  For the direct aider and [abettor], the actus reus includes whatever acts constitute aiding the commission of the life endangering act.  [¶]  Thus to be liable for implied malice murder, the direct aider and [abettor] must by words or conduct aid the commission of the life endangering act not the result of that act.  [¶]  The mens rea which must be personally harbored by the direct aider and [abettor] is knowing that the perpetrator intended to commit the act, intend to aid the perpetrator in the commission of the act, knowledge the act is dangerous to human life, and acting in conscious disregard to human life.  [¶] . . . [¶]  I will interpret life endangering act to mean conduct that endangers the life of another."

After extensively reciting the evidence in the case, the court continued:  "[W]hen [M.G.] or [his girlfriend] honked the horn, that really disturbed Mr. Cervin.  As evidenced by the fact he continues to make the left turn, goes about one or two houses, and then backs up his car, blocks in [the] vehicle on the driveway, and they have this confrontation between Mr. Cervin, his passenger he claims is Nick, and Mr. -- the decedent.  [¶]  I find a life endangering act which Mr. Cervin aided and abetted through his own actions, the confrontation of [M.G.] by a vehicle primarily filled with gang members, one of which is armed, after which Mr. Cervin feels disrespected.  [¶] . . . [¶] To believe that Mr. Cervin did not know that his passenger was armed is not credible. Even though he claims in his interview that he told this Nick to leave the gun behind . . . [it] is just not believable.  [¶]  And the life endangering act is when Mr. Cervin, who was in charge of the vehicle, figuratively and literally is the driver of this incident and the driver of the vehicle, knew that he was facilitating a car containing armed gang members reengaging [M.G.] over perceived disrespect.  [¶]  That encounter would escalate to [M.G.'s] death because of the presence of a gun and in gang culture.  [¶]  By turning his vehicle around and reengaging [M.G.] with a vehicle mostly filled with other gang members, Mr. Cervin demonstrates his intention to endanger [M.G.'s] life."

5

"The Court is convinced beyond a reasonable doubt that Cervin knew [M.G.] being confronted by a vehicle filled with mainly gang members was dangerous to [M.G.'s] life. [¶] Cervin admitted this much when he stated to the officers it was bad for him to turn his vehicle around to confront [M.G.] And this interview was played in total for the jury during his trial. [¶] So the Court does find beyond a reasonable doubt that Cervin consciously disregarded that danger by turning his vehicle around, driving back to [M.G.'s] home, and aggressively engaging him from inside of his vehicle in front of other gang members in the car. [¶] The sequence of events leads the Court to determine that Mr. Cervin intended his actions to assist all the members of his vehicle, including Nick, in violently confronting [M.G.] [¶] Just as important, the Court is convinced beyond a reasonable doubt that under the auspices of gang culture, Cervin knew that the other gang members in his vehicle, particularly Nick, since he was armed with a handgun would intend to respond violently to [M.G.'s] perceived disrespect. Cervin placed him in a position to confront [M.G.] [¶] And once Mr. Cervin turned his car around, Cervin placed Nick in such a position and knew Nick would intend to respond violently to [M.G.] over his perceived disrespect."

"So the Court notes it's unlikely without the assistance of Mr. Cervin that Nick would decide to reengage [M.G.] for a violent confrontation with the gun. [¶] Again, for the obvious reason: Mr. Cervin is driving the vehicle. Mr. Cervin is the one who sees -- what he perceives [M.G.] flip him off in the rear-view mirror. It's Mr. Cervin who backs up the car and parks it to block in [M.G.'s girlfriend]. It's Mr. Cervin who ro[lls] down the window and has words with [M.G.] along with the passenger Nick. [¶] So, more importantly, Nick was not the driver of the vehicle that was disrespected . . . . [¶] Under the hyperaggressive gang culture . . . that demanded that Cervin, as the vehicle's driver, make a decision of how to respond to being directly disrespected. And when he turned the vehicle around, it assured a life endangering situation for [M.G.] [¶] So based on the foregoing, the Court finds Mr. Cervin is guilty beyond a reasonable doubt of second

6

degree implied malice murder under an aiding and abetting theory, and this petition is denied."

In explaining its decision, the court noted at one point "there could be an argument [of] express malice" by Cervin. That said, the court only found Cervin was guilty of aiding and abetting implied malice murder. Cervin filed a notice of appeal with this court in April 2023. His opening brief was filed in February 2024, and this case was fully briefed on July 9, 2024.

DISCUSSION

*Application of Legal Requirements of Aiding and Abetting Implied Malice Murder*

Cervin argues the trial court misapplied the law of aiding and abetting implied malice murder.

In *Powell*, *supra*, 63 Cal.App.5th 689, we explained that "[i]n the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, fns. & italics omitted.)

After the trial court denied Cervin's petition, our Supreme Court elaborated on implied malice murder liability in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*). There, the defendant and his fellow gang members were riding their bikes near rival gang territory when one of the gang members shot the driver of a passing car, killing him. (*Id.* at p. 985.) Our Supreme Court first held that substantial evidence did not support a guilty finding of implied malice murder on a direct perpetrator theory, in part because the

7

consequences of the defendant's acts were not sufficiently dangerous to human life. (*Id.* at pp. 988-990.) The court explained that to "suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*Id.* at p. 989.) Our Supreme Court next considered whether the defendant could be guilty of implied malice murder as an aider and abettor. (*Id.* at pp. 990-992.) In evaluating this claim, the court expressly adopted the standard we set forth in *Powell*, *supra*, 63 Cal.App.5th 689. (*Reyes*, at pp. 990-991.) Because the trial court in that case had misunderstood the legal requirements of aiding and abetting implied malice murder, our Supreme Court remanded the matter. (*Id.* at pp. 991-992.)

A reviewing court presumes the trial court knew and correctly applied the law unless the record indicates otherwise. (See *People v. Jacobo* (1991) 230 Cal.App.3d 1416, 1430.) Here, we are not persuaded the trial court misapplied the law of aiding and abetting implied malice murder.

Cervin contends the trial court misapplied the law in several respects. First, he suggests the trial court erred in concluding his acts were "life endangering" because those acts did not involve a " 'high degree of probability' " that they " 'would result in death,' " as discussed in *Reyes*, *supra*, 14 Cal.5th 981. But as an *aider and abettor*, Cervin's acts need not have been "life endangering" themselves; they need only "aid the commission of the life endangering act." As Cervin readily acknowledges, it is the direct perpetrator's act—here, the shooting of the victim by Nick—that was the relevant "life endangering act."

Next, and relatedly, Cervin submits that the trial court misunderstood that the shooting was the relevant "life endangering act" and as a result misapplied aiding and abetting principles. This argument seems to be premised on the fact that: (1) the court never expressly used the word "shooting" to describe the life-endangering act, instead

8

referring to it as a confrontation; and (2) the court separately referred to Cervin's acts as "life endangering."

We reject Cervin's reading of the trial court's decision. Considering the court's ruling in its entirety, we conclude the court understood the law and correctly applied it. The court first accurately set forth the elements of aiding and abetting implied malice murder. It then explained the connection between Cervin's acts, Nick's acts, and the victim's death: "[I]t's unlikely without the assistance of Mr. Cervin that Nick would decide to reengage [M.G.] for a violent confrontation with the gun. [¶] Again, for the obvious reason: Mr. Cervin is driving the vehicle. Mr. Cervin is the one who sees --what he perceives [M.G.] flip him off in the rear-view mirror. It's Mr. Cervin who backs up the car and parks it to block in [M.G.'s girlfriend]. It's Mr. Cervin who ro[lls] down the window and has words with [M.G.] along with the passenger Nick. [¶] . . . [¶] Under the hyperaggressive gang culture . . . that demanded that Cervin, as the vehicle's driver, make a decision of how to respond to being directly disrespected. And when he turned the vehicle around, it assured a life endangering situation for [M.G.]"

Cervin insists the trial court incorrectly found he aided and abetted a "confrontation" that preceded the shooting, but not the shooting itself. Again, we reject Cervin's overly narrow reading of the decision. While the court never used the word "shooting" to describe the life-endangering act, we think it is clear that when the court discussed how Cervin assisted Nick in the "violent confrontation with the gun," the court was referring to the shooting and not some other separate and distinct confrontation. This understanding is confirmed by the trial court's comments to defense counsel at a hearing on this very issue: "There could be acts that the direct aider and abettor participated in that lead to the life endangering act itself of the acts of the shooter, the perpetrator? [¶] . . . [¶] Life endangering act. In this case I totally agree with you. The act is pulling a gun and firing it at [M.G.] That's the life endangering act. The question for me is, is Mr. Cervin a direct aider and abettor?"

9

It is true that the trial court also described Cervin's acts as life endangering. But we do not believe this evinces a misunderstanding of the law. Rather, the fact that Cervin's acts were themselves life endangering, while not strictly necessary under the legal requirements for aiding and abetting implied malice murder, is relevant to his state of mind and intent. As the court explained, "[b]y turning his vehicle around and reengaging [M.G.] with a vehicle mostly filled with other gang members, Mr. Cervin demonstrates his *intention to endanger* [M.G.'s] life." (Italics added.) The dangerousness of Cervin's actions also support the court's belief, expressed in dicta, that his culpability was even greater than that of an aider and abettor of implied malice murder.

Cervin also submits that the trial court misapplied the law by interpreting "life endangering act" to mean "conduct that endangers the life of another." This argument is unavailing. While *Reyes* expanded on the definition of "life endangering act" by explaining the act must involve a " ' "high degree of probability that it will result in death," ' " (*Reyes*, *supra*, 14 Cal.5th at p. 989) the court's definition here was still correct. Further, there is no dispute in this case that the relevant life-endangering act—the shooting of the victim by Nick—was "life endangering" under any understanding of that term.

*Substantial Evidence*

Cervin argues the trial court erred in denying his resentencing petition because insufficient evidence supports the conclusion that he is guilty of aiding and abetting implied malice murder.

We review the denial of a section 1172.6 petition for substantial evidence. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there

10

is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)

Cervin concedes the evidence was sufficient to prove Nick committed a life-endangering act. However, he maintains the evidence was insufficient to prove that he: (1) knew Nick intended to shoot the victim; (2) committed an act that assisted in the shooting; and (3) acted with conscious disregard for human life.

We are not convinced. On the first point, Cervin argues there is no *direct* evidence—for example, a conversation between Cervin and Nick in which they discuss shooting the victim—showing Cervin knew Nick's intentions. But "[k]nowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495.) Here, the evidence established that: Cervin saw Nick with the gun prior to the shooting; honking at a car with gang members is considered disrespectful in gang culture; and a shooting is a foreseeable retaliatory act in response to disrespect. From this evidence, it can reasonably be inferred that Cervin knew Nick was armed at the time and knew that Nick would shoot M.G. because he had honked. Moreover, Cervin's lack of remorse immediately after the shooting—when he appeared to have "just had a good time"—further supports the inference that he was aware of the shooter's intent.

11

As to whether Cervin committed an act that assisted in the shooting, he contends the trial court "implicitly found that there was no evidence that appellant aided and abetted the perpetrator's life endangering act." This is simply incorrect. The court explained how the undisputed evidence showed Cervin positioned Nick to shoot the victim by reversing the car to the victim's home. Further, Cervin rolled down the window, which enabled Nick to have a cleaner shot of the victim. Cervin repeats the argument that the trial court only found that he aided and abetted a confrontation "*before* the shooting*" but not the shooting itself. We have already rejected that argument, *ante*.

Finally, substantial evidence supports the conclusion that Cervin acted with conscious disregard for human life. As discussed, the evidence establishes that a shooting could foreseeably occur in response to a showing of disrespect. Cervin nonetheless brought a car with gang members, one of whom was armed, to the victim's front door immediately after the victim had just disrespected them. Cervin argues because he only intended to beat up the victim, he did not act with conscious disregard for life. The court was not required to credit Cervin's self-serving assertion that he only intended to assault the victim—especially given that Cervin said earlier that night he was looking to shoot someone. Moreover, given the deferential standard of review, we reject inferences contrary to the court's ruling. (See *People v. Myles* (2023) 89 Cal.App.5th 711, 740 ["for purposes of substantial evidence review, we are not permitted to draw inferences contrary to the verdict"].)

Having found that substantial evidence supports the trial court's conclusion, we reject Cervin's sufficiency of the evidence challenge.

## DISPOSITION

The order denying Cervin's section 1172.6 petition for resentencing is affirmed.


                                              /s/
                                      BOULWARE EURIE, J.


We concur:


      /s/
KRAUSE, Acting P. J.


      /s/
FEINBERG, J.